USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 12/3/19

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ANHUI KONKA GREEN LIGHTING CO., LTD.,

                                        Plaintiff,

                    -v-

GREEN LOGIC LED ELECTRICAL SUPPLY, INC.,
GEORGE GEFFEN, and DOES 1–100,

                                        Defendants.

---

18 Civ. 12255 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

Plaintiff Anhui Konka Green Lighting Co., Ltd. ("Konka"), is a Chinese corporation that manufacturers and sells LED lights. Konka is suing defendants Green Logic LED Electrical Supply, Inc. ("GLL"), GLL's founder and CEO George Geffen, and Does 1–100, in connection with GLL's alleged failure to pay Konka for such lights, and GLL's alleged false representations that induced Konka to ship more lights to GLL. Specifically, Konka brings claims for breach of contract, fraud, and quantum meruit against GLL and a claim of fraud against Geffen.

The Court previously dismissed Konka's first amended complaint for lack of subject matter jurisdiction because it included, as a defendant, Daniel Yu, a GLL employee and Canadian citizen, which destroyed diversity of citizenship. That decision was without prejudice. Konka filed a second amended complaint, no longer suing Yu. Now pending is defendants' motion to dismiss as inadequately pled Konka's fraud claims in the second amended complaint.

For the reasons that follow, the Court denies the motion to dismiss Konka's fraud claim against GLL, but grants the motion to dismiss, with leave to amend, the fraud claim against Geffen.

## I.    Background

### A.    Factual Background[1]

The Court incorporates by reference the factual background outlined in its August 8, 2018 motion to dismiss opinion.[2]  Dkt. 34 ("Aug. 8, 2019 Op.") at 2–5.  The Court reviews here only the facts necessary to determine the pending motion to dismiss.

On February 13, 2017, Konka employees Yidi Zhang and Ling Liu visited GLL's offices in New York.  SAC ¶ 19.  At GLL's offices, Zhang and Liu met with Geffen.  *Id.*  Geffen introduced Zhang and Liu to Daniel Yu, a GLL employee and "business operations leader" who was tasked with obtaining vendors and products for GLL.  *Id.*  Specifically, Yu was part of a China-based team charged with evaluating new partners and products, which could be sold in the United States.  *Id.* ¶¶ 3, 19.  During that visit, Zhang, Liu, Geffen, and Yu participated in a conference call on which Geffen confirmed that Yu was a GLL employee and authorized him to enter into contracts on behalf of GLL.  *Id.* ¶ 19.

Sometime later in February 2017, Yu and Michael Kuang, another GLL employee, visited a Konka factory in China.  *Id.* ¶ 20.  The SAC alleges that Yu and Kuang are officers and employees of GLL.  *Id.* ¶ 34.  After the February 2017 visit, GLL submitted a series of purchase orders to Konka, which Konka began to fulfill.  *See id.* ¶¶ 21–23.

---

[1] This account is drawn from Konka's second amended complaint.  Dkt. 36 ("SAC").  For the purposes of resolving a motion to dismiss, the Court accepts all factual allegations in the SAC as true, drawing all reasonable inferences in plaintiff's favor.  *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

[2] The substantive allegations in Konka's second amended complaint are substantially identical to those in the first.  Dkt. 26 ("FAC").  The principal change is the removal of Yu as a defendant for purposes of maintaining diversity jurisdiction.  Although not relevant to this decision, the Court notes that Konka now seeks compensatory damages in the amount of $1,609,963, SAC ¶ 91, down from the earlier $1,818,052, FAC ¶ 103.

On or about March 2017, Kuang returned to a Konka factory to inspect Konka's first batch of lights. *Id.* ¶ 24. At that time, Konka informed Kuang that the China Export and Credit Insurance Corporation's Sinosure program ("Sinosure"), which vetted potential buyers and insured Konka against buyer credit defaults up to specific amounts, would limit how many lights GLL could order from Konka without up-front payment. *See id.* ¶¶ 6, 24.

On or about March 25, 2017, Yu and Kuang told Konka, via the Internet platform "WeChat," that "In Style USA, INC." ("In Style") was an affiliate of GLL, owned by Yu or his family. *Id.* ¶ 25. Yu and Kuang represented that GLL and In Style had authorized Yu to act on In Style's behalf. *Id.*; *see also id.* ¶ 7. Yu, in fact, was not authorized to act for In Style. *Id.* ¶ 10. On or around the same date, Kuang provided Konka with In Style's company information to submit to Sinosure to obtain a line of credit. *Id.* ¶ 25. And, via electronic communication, Yu and Kuang told Konka that In Style wished to purchase lights. *Id.* ¶¶ 26–27. The SAC alleges that Yu and Kuang's representations were false, Yu and Kuang knew the representations were false when made, and Yu and Kuang made such representations to induce Konka to ship additional products for which it would not be paid. *Id.*

On or about April 20, 2017, Yu and Kuang did the same thing with JED Lights, Inc. ("JED Lights," and together with In Style, the "Affiliates"). They represented to GLL that JED Lights was also a Yu-family-owned affiliate of GLL, which, along with GLL, had authorized Yu to conduct business for it. *Id.* ¶ 29; *see also id.* ¶ 7. As with In Style, Yu was never authorized to act for JED Lights. *Id.* ¶ 10. Kuang submitted JED Lights' information to Konka to submit to Sinosure. *Id.* ¶ 29. Yu and Kuang represented to Konka that JED Lights was interested in Konka's lights, knowing such a representation was false. *Id.* ¶¶ 30–31. They, nevertheless, made that representation to induce Konka to ship lights for which it would not be paid. *Id.*

Relying on Yu and Kuang's representations, Konka submitted the Affiliates' information to Sinosure. *Id.* ¶ 34.

Kuang and Yu falsified GLL purchase orders to reflect that they were from the Affiliates rather than from GLL. *Id.* ¶¶ 28, 32. Specifically, on or around April 26, 2017, Yu modified the orders, using his GLL email, to indicate that such orders were coming from the Affiliates. *Id.* ¶ 35. In April 2017, GLL submitted Purchase Orders 10155 and 10159—orders that Yu and Kuang had modified to be from In Style and JED Lights—to Konka. *Id.* ¶ 33. Purchase Order 10155 was from In Style and called for a shipment of 42,138 items, to be delivered to GLL's Manhattan and Farmington offices, for $798,351 plus a 5.9% import tax. *Id.* ¶¶ 21(i), 38. Purchase Order 10159 was a JED Lights order for 14,126 items to GLL's Manhattan office for $360,213 plus a 5.9% import tax. *Id.* ¶¶ 21(j), 39. The SAC alleges that Geffen knew about the fabricated purchase orders and knew that Konka would rely on such orders. *Id.* ¶¶ 63–64.

Konka shipped these products, valued at $1,127,380, to the indicated GLL offices, and they were accepted by GLL. *Id.* ¶¶ 21(i)–(j), 38–39, 77. The SAC states that Konka would not have made shipments for the Affiliates without Yu and Kuang's false representations, and that Konka's reliance on these representations was reasonable. *See id.* ¶¶ 38–39, 41; *see also id.* ¶¶ 66, 77.

The SAC alleges that Yu was acting together with officers, directors, and managers of GLL to promote this scheme. *Id.* ¶ 9. Specifically, it claims that Geffen knew that Yu and Kuang made these false representations and misrepresented GLL's relationship with the Affiliates to induce Konka to ship products to GLL without being paid. *Id.* ¶¶ 61–62. Konka claims that Geffen, as a GLL officer, had a duty to disclose his knowledge about these false representations. *Id.* ¶ 65.

GLL failed to pay more than $1.6 million that it owed Konka.  *Id.* ¶¶ 42, 56.  Because of misrepresentations from GLL, Yu, and Kuang about the Affiliates, Sinosure declined to insure those transactions against default.  *Id.* ¶ 12.

### B.    Procedural History

On December 27, 2018, Konka filed its initial complaint, Dkt. 1, which it modified on December 28, 2018, Dkt. 7.  On January 17, 2019, defendants filed their first motion to dismiss, Dkt. 18, and a memorandum of law in support, Dkt. 19.  On January 22, 2019, the Court issued an order directing Konka either to amend its complaint or oppose the motion to dismiss.  Dkt. 20.

On February 7, 2019, Konka filed its first amended complaint.  FAC.  On February 27, 2019, defendants filed their second motion to dismiss, Dkt. 29, accompanied by a memorandum of law, Dkt. 30.  On March 13, 2019, Konka filed its opposition.  Dkt. 31.  On March 18, 2019, defendants filed their reply, Dkt. 33, along with a declaration from Richard Pu, Dkt. 32, and various exhibits.  On August 8, 2019, the Court resolved defendants' second motion to dismiss in their favor, dismissing the complaint for lack of subject matter jurisdiction, without prejudice to Konka's ability to replead in a manner consistent with subject matter jurisdiction.  Aug. 8, 2019 Op. at 10.

On August 13, 2019, Konka filed its second amended complaint, the operative complaint here.  SAC.  On August 20, 2019, defendants filed their third motion to dismiss, Dkt. 37, with a memorandum of law in support, Dkt. 38 ("Def. Mem.").  On August 21, 2019, the Court issued a new amend or oppose order, Dkt. 39.  On September 10, 2019, Konka filed its opposition to the motion to dismiss.[3]  Dkt. 42 ("Pl. Mem.").  On September 17, 2019, defendants filed their reply,

_____

[3] In their reply, defendants argued that the Court should disregard Konka's opposition memorandum as untimely.  *See* Dkt. 44 ("Def. Reply") at 1.  The Court rejects this argument. After Konka filed its SAC and defendants filed their responsive motion to dismiss, the Court

Def. Reply, and a declaration from Pu in support, Dkt. 43, with attached exhibits. On September 18, 2019, Konka filed a letter with an attached exhibit, in reply to an exhibit filed by defendants. Dkt. 45.

On September 30, 2019, the parties filed a proposed case management plan. Dkt. 50. On October 11, 2019, the Court held an initial pretrial conference and approved the parties' case management plan. Dkt. 52.[4]

## II.    Applicable Legal Principles

### A.    Federal Rule of Civil Procedure 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.

For the purpose of resolving a motion to dismiss, the Court must assume all well-pled facts to be true, drawing all reasonable inferences in favor of the plaintiff. *See Koch*, 699 F.3d

---

issued an amend or oppose order, instructing Konka to either amend its SAC or file its opposition to the motion to dismiss by September 10, 2019. Dkt. 39 at 1. Konka timely filed its opposition on September 10, 2019.

[4] Upon learning at the conference that defense counsel Pu had not informed his clients of their duty to preserve evidence, the Court ordered Pu to file an affidavit reflecting that he since had done so and detailing the evidence, if any, that defendants had disposed of. Dkt. 53. On October 15, 2019, Pu filed such a declaration. Dkt. 54; *see also* Dkt. 51. On October 17, 2019, Konka filed a declaration from Ling Liu, opposing some statements in Pu's declaration. Dkt. 56. The Court notified the parties that they are at liberty during discovery to pursue claims of spoliation if warranted. *See* Dkts. 55, 57.

at 145. That tenet, however, "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. A pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

### B.     Federal Rule of Civil Procedure 9(b)

In evaluating whether a complaint alleging fraud states a claim, the Court also applies Rule 9(b). It provides that where "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Rule 9(b) "requires that the plaintiff '(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent.'" *Eternity Glob. Master Fund, Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 187 (2d Cir. 2004) (quoting *Harsco Corp. v. Segui*, 91 F.3d 337, 347 (2d Cir. 1996)).

Although Rule 9(b) contains a heightened particularity standard, it also relaxes the standard for pleading fraudulent intent:  "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). The Second Circuit, however, has cautioned that "we must not mistake the relaxation of Rule 9(b)'s specificity requirement regarding condition of mind for a license to base claims of fraud on speculation and conclusory allegations[,] . . . plaintiffs must allege facts that give rise to a strong inference of fraudulent intent." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006) (alteration in original) (quoting *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 52 (2d Cir. 1995)). Such a "strong inference" can be established either "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscience misbehavior or recklessness." *Id.* at 290–91 (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)). To determine if the "strong inference"

7

requirement is met, a court should "consider the complaint in its entirety and take into account plausible opposing inferences." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Secs., LLC*, 797 F.3d 160, 177 (2d Cir. 2015) (citation omitted). If the inference is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged," then it is sufficiently strong. *Id.* (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007)).[5]

## C.    Common Law Fraud

The parties treat New York law as governing this dispute. *See, e.g.*, Def. Mem. at 8 (citing New York law); Pl. Mem. at 7 (same). The Court will do the same. *See Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000) ("The parties' briefs assume that New York law controls, and such implied consent . . . is sufficient to establish choice of law." (internal quotation marks and citation omitted)). Under New York law, a common law fraud claim must plead the elements of fraud and satisfy Rule 9(b)'s heightened pleading standard. *See Matana v. Merkin*, 957 F. Supp. 2d 473, 484 (S.D.N.Y. 2013). As to the elements for fraud, a plaintiff must allege: "(1) a material misrepresentation or omission of a fact, (2) knowledge of that fact's falsity, (3) an intent to induce reliance, (4) justifiable reliance by the plaintiff, and (5) damages." *Loreley*, 797 F.3d at 170 (citing *Eurycleia Partners, LP v. Seward & Kissel, LLP*, 12 N.Y.3d 553, 559 (2009)).

---

[5] Although the Supreme Court's discussion in *Tellabs* addressed inferences of scienter under securities fraud statutes and thus "does not directly control this case," this guidance is nonetheless helpful in assessing when a "strong inference" of fraudulent intent arises in connection with a common law fraud claim. *See Glidepath Holding B.V. v. Spherion Corp.*, 590 F. Supp. 2d 435, 451 n.10 (S.D.N.Y. 2007).

## III. Discussion

Defendants move to dismiss two of Konka's claims: (1) for fraud, against GLL; and (2) for fraud, against Geffen.[6] The Court addresses each in turn.

### A. Fraud by GLL

Defendants argue that Konka, for two reasons, fails to comply with Federal Rule of Civil Procedure 9 in pleading fraud against GLL. First, defendants note that the fraud claim against GLL is based on the allegedly fraudulent misrepresentations of GLL employees Yu and Kuang, and they argue that Konka's allegations of fraudulent intent on the part of these employees are conclusory. *See* Def. Mem. at 2, 7. Second, defendants assert that Konka's claims of reasonable reliance are conclusory. *Id.* at 3, 7. The Court rejects both arguments.

#### 1. Fraudulent Intent

The Court first turns to defendants' argument that the SAC failed sufficiently to allege fraudulent intent or scienter on the part of GLL.

##### a. Corporate Intent

Because GLL is a corporate entity, the SAC must allege facts that "create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter."[7] *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190,

---

[6] Defendants initially moved to dismiss Konka's quantum meruit claim, arguing that it was duplicative of the breach of contract claim. *See* Def. Mem. at 9–10. In their opening brief, defendants acknowledged that quantum meruit and breach of contract claims can be pled in the alternative, but argued that such pleading is only permitted where there is a dispute about whether the contract exists; here, they concede that there was a contract. *Id.* However, in their reply, defendants stated that they now dispute the existence of a contract and, as a result, have withdrawn their motion to dismiss the quantum meruit claim. Def. Reply at 9.

[7] Fraudulent intent can also be sufficiently pled against a corporation if the allegedly fraudulent statements "'would have been approved by corporate officials sufficiently knowledgeable about the company to know' that those statements were misleading." *Silvercreek Mgmt., Inc. v.*

195 (2d Cir. 2008) (securities fraud context); *see also Silvercreek Mgmt., Inc.*, 248 F. Supp. 3d at 439 (New York common law fraud context). Konka's claim of fraud is mainly based on representations by Yu and Kuang. Although Konka also cites fraud based on representations by Geffen, this claim, addressed below, is weaker. *See infra* pp. 22–26. As a result, the Court focuses here on the claims against Yu and Kuang and whether their intent can properly be imputed to GLL.

A corporation's scienter "is necessarily derived from its employees." *In re Marsh & Mclennan Cos., Sec. Litig.*, 501 F. Supp. 2d 452, 481 (S.D.N.Y. 2006). There is no bright-line rule or "simple formula" for determining when an employee's intent is imputed to a corporation, including "how senior [the] employee must be in order to serve as a proxy for corporate scienter." *Id.* Although there is no "seniority prerequisite" for an employee's intent to be imputed, *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 515 (S.D.N.Y. 2009), courts in this District have "readily attributed the scienter of management-level employees to corporate defendants," *In re Marsh*, 599 F. Supp. 2d at 481. No court has defined the parameters of who qualifies as a "management-level employee." *Thomas v. Shiloh Indus., Inc.*, No. 15 Civ. 7759 (KMW), 2017 WL 2937620, at *3 (S.D.N.Y. July 7, 2017). But it is clear that "management-level employees" include officers acting within the scope of their employment. *In re Ambac Fin. Grp., Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 265 (S.D.N.Y. 2010) (courts "routinely impute" intent in that circumstance).

The facts the SAC alleges related to Yu and Kuang's seniority suffice, at this stage, for their intent to be imputed to GLL. It describes Yu as a GLL "employee," *see* SAC ¶ 3, "business

---

*Citigroup, Inc.*, 248 F. Supp. 3d 428, 439 (S.D.N.Y. 2017) (quoting *Loreley*, 797 F.3d at 177). Konka, however, has not alleged facts of this nature.

operations leader," *id.* ¶ 19, and "officer," *id.* ¶¶ 34, 71.  Similarly, Kuang is pled to be "an

associate" of Yu, *id.* ¶ 20, and a GLL "employee," *see id.* ¶ 20, and "officer," *id.* ¶¶ 34, 71.  As

discussed more fully below, Yu and Kuang were "at the center" of the fraudulent scheme here.

*See In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 408–09 (S.D.N.Y. 2016) (holding that if

plaintiff had pled sufficient circumstantial evidence to support the fraudulent knowledge of a

vice president and an assistant vice president "at the center" of a scheme, their intent could have

been imputed to corporation).  This, in conjunction with Yu's operations leader and officer role

and Kuang's officer role, are sufficient to bind GLL on a motion to dismiss.  *See In re Ambac*

*Fin. Grp.*, 693 F. Supp. 2d at 265.[8]  To be sure, Yu and Kuang's precise job titles and

responsibilities are questions of fact that are not apparent from the face of the complaint.  The

Court expects that discovery will permit a more nuanced assessment of whether, and to what

extent, their intent is properly imputed to GLL.

---

[8] This issue commonly arises in the context of securities fraud litigation.  In both the securities
fraud and common law fraud contexts, courts have imputed to the corporate defendant intent
based on the intent of employees with varying levels of seniority.  *See, e.g.*, *Loreley*, 797 F.3d at
177 (imputing intent of managing director to corporation); *In re Banco Bradesco S.A. Sec. Litig.*,
277 F. Supp. 3d 600, 667 (S.D.N.Y. 2017) (same for senior officers); *Patel v. L-3 Commc'ns*
*Holdings Inc.*, No. 14 Civ. 6038 (VEC), 2016 WL 1629325, at *14–15 (S.D.N.Y. Apr. 21, 2016)
(same for subsidiary unit's CFO, who was "below the corporate level"); *In re Sanofi*, 155 F.
Supp. 3d at 408–09 (same for vice president and assistant vice president of various units, had
plaintiffs alleged facts to support their fraudulent behavior); *Pa. Pub. Sch. Emps' Ret. Sys. v.*
*Bank of Am. Corp.*, 874 F. Supp. 2d 341, 363–64 (S.D.N.Y. 2012) (same for vice president,
assistant vice president, and general counsel); *Richman v. Goldman Sachs Grp., Inc.*, 868 F.
Supp. 2d 261, 281 n.10 (S.D.N.Y. 2012) (same for mortgage department head); *In re Ambac Fin.*
*Grp.*, 693 F. Supp. 2d at 265 (same for CEO, CFO, executive vice president, and member of
committee that approved fraud); *Glidepath Holding B.V.*, 590 F. Supp. 2d at 453 (same for
managing director of defendant corporation's subsidiary); *Lapin v. Goldman Sachs Grp., Inc.*,
506 F. Supp. 2d 221, 242 (S.D.N.Y. 2006) (same for senior analysts and investment bankers); *In*
*re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 443 (S.D.N.Y. 2005) (same for CEO, regional vice
president, vice president of corporate finance, and unidentified senior managers); *In re JP*
*Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 627 (S.D.N.Y. 2005) (same for vice chairman,
vice president, and managing director).

The SAC also states sufficient facts to show that Yu and Kuang were acting within the scope of their employment when they made their allegedly false representations about the Affiliates to Konka. In addition to alleging that the two were acting within the course and scope of their employment, SAC ¶¶ 7, 26–27, 30–31, the SAC alleges that Yu and Kuang carried out employment-related duties, such as meeting with Konka, visiting Konka factories, inspecting products, submitting purchase orders, and making representations on behalf of GLL, *see, e.g.*, *id.* ¶¶ 8, 19–20, 24–39. Konka also claims that Geffen confirmed, on a conference call, that Yu was employed by GLL and authorized to contract on its behalf. *Id.* ¶ 19. That the representations Yu and Kuang made were false does not take them outside the scope of their employment. *Glidepath Holding B.V.*, 590 F. Supp. 2d at 453 (employee does not act outside authority because he "is engaged in fraud upon a third person" (citation omitted)).

### b. Particularity

Defendants argue that the SAC relies only on conclusory allegations of fraudulent intent, in contravention of Rule 9(b). *See* Def. Mem. at 7; Def. Reply at 2. Although Rule 9(b) allows for intent to be pled generally, it requires that such allegations be supported by facts that support a strong inference of fraudulent intent. *Dietrich v. Bauer*, 76 F. Supp. 2d 312, 329 (S.D.N.Y. 1999). Specifically, Konka was required to plead with particularity the circumstances surrounding the fraud, *see* Fed. R. Civ. P. 9(b), by (1) outlining the fraudulent statements or actions, (2) identifying the speaker or actor, (3) stating when and where such statements or actions occurred, and (4) explaining why the statements or actions were fraudulent, *see Eternity Global Master Fund, Ltd.*, 375 F.3d at 187.

To evaluate whether Konka's claims are sufficiently particular, the Court first identifies the statements and actions alleged to be fraudulent. *See Glidepath Holding B.V.*, 590 F. Supp. 2d at 452. These are as follows:

- On or about March 25, 2017, after learning of Sinosure's restrictions on future orders from GLL, Kuang submitted In Style's company information to Konka and requested that Konka submit In Style's information to Sinosure for a credit line application. *See* SAC ¶¶ 24–25.

- On or about March 25, 2017, in an electronic meeting via WeChat, Yu and Kuang told Konka that In Style was owned by Yu or his family and was a GLL affiliate. *Id.* ¶ 25. They also stated that GLL and In Style had authorized Yu to act on In Style's behalf. *Id.* In fact, Yu was never authorized to act for In Style. *Id.* ¶ 10.

- On or about March 25, 2017, via electronic correspondence, Yu and Kuang both told Konka, falsely, that GLL affiliate In Style wanted to order lights from Konka. *Id.* ¶¶ 26–27. Yu and Kuang knew these representations were false and made them to induce Konka to ship more products to GLL on credit, knowing that Konka would not be paid. *Id.*

- On or about April 20, 2017, Kuang submitted JED Lights' company information to Konka and requested that Konka submit JED Lights' information to Sinosure for a credit line application. *Id.* ¶ 29.

- On or about April 20, 2017, in an electronic meeting via WeChat, Yu and Kuang told Konka that JED Lights was owned by Yu or his family and was a GLL affiliate. *Id.* They also stated that GLL and In Style had authorized Yu to act on JED Lights' behalf. *Id.* In fact, Yu was never authorized to act for JED Lights. *Id.* ¶ 10.

- On or about April 20, 2017, Yu and Kuang both told Konka, falsely, that GLL affiliate JED Lights wanted to order lights from Konka. *Id.* ¶¶ 30–31. Yu and Kuang

knew these representations were false and made them to induce Konka to ship more products to GLL on credit, knowing that Konka would not be paid. *Id.*

- Yu and Kuang modified GLL purchase orders to reflect, falsely, that such orders were from In Style and JED Lights. *Id.* ¶¶ 28, 32. Specifically, on or about April 26, 2017, Yu modified purchase orders, using his GLL company email, to indicate that they were coming from In Style and JED Lights. *Id.* ¶ 35. Yu did this to further the scheme and deceive Konka. *Id.*

- In April 2017, GLL submitted Purchase Orders 10155 and 10159, the purchase orders that Kuang and Yu had modified, to Konka. *Id.* ¶ 33. These called for product delivery to GLL's Manhattan and Farmington offices for In Style and to GLL's Manhattan office for JED Lights. *Id.* ¶¶ 38–39.

These allegations easily satisfy the Rule 9(b) particularity requirements. For each, the SAC identifies a specific statement or action, actor, and date.[9] *See Amusement Indus., Inc. v. Stern*, 786 F. Supp. 2d 758, 774–75 (S.D.N.Y. 2011) (statements "easily satisf[ied] the first three elements" of Rule 9(b) particularity where they identified content, speaker, and time for statements). The SAC also explains why these were fraudulent: The representations to Konka, either through statements or modified purchase orders, were false, and were made to induce Konka to continue to ship products to GLL without being paid.[10] *See id.* at 775 (statements

---

[9] Although Konka twice alleges that Yu and Kuang modified purchase orders for In Style and JED Lights without a specific date, *see* SAC ¶¶ 28, 32, Konka also states that Yu modified the purchase orders on April 26, 2017 and that GLL submitted the modified purchase orders—orders 10155 and 10159—to Konka in April 2017, *see id.* ¶¶ 33, 35. As a result, the claims that Yu and Kuang falsified purchase orders are associated with specific dates as to satisfy Rule 9(b).

[10] To be sure, an allegation of future nonperformance, *i.e.*, GLL's intent not to pay Konka for lights it shipped, would not be sufficient, without more, to give rise to a fraud claim. *See Pot*

satisfied fourth element when plaintiff alleged statements were false and made to induce it to place money in escrow).

Defendants argue that the claims that Yu and Kuang's representations were false or made to induce Konka to ship products are conclusory. *See* Def. Mem. at 2–3 (citing SAC ¶¶ 26–28, 30–32, 73, 76). But while these are general statements of intent, a plaintiff's pleadings can still satisfy Rule 9(b) as long as the other circumstances of fraud are alleged with particularity and give rise to strong inferences of intent. Importantly, these representations are not the only ones defendants allegedly made. And they provide context as to why the specific representations that Yu and Kuang made to Konka about In Style and JED Lights' false affiliate status and desire for Konka products were fraudulent. Konka, therefore, has satisfied the particularity requirements of Rule 9(b) for the GLL fraud claim.

### c. *Strong Inference of Fraudulent Intent*

The facts alleged by the SAC must also give rise to a strong inference of fraudulent intent. *See Lerner*, 459 F.3d at 290. Konka can do so by alleging facts showing either (1) that GLL, through Yu and Kuang, had a motive and opportunity to commit the fraud, or (2) strong

---

*Luck, LLC v. Freeman*, No. 06 Civ. 10195 (DAB), 2010 WL 908475, at *4 (S.D.N.Y. Mar. 8, 2010). "[A] promissory statement of what will be done in the future" supports instead a breach of contract claim under New York law. *See M-101, LLC v. iN Demand LLC*, No. 06 Civ. 12938 (DLC), 2007 WL 4258191, at *3 (S.D.N.Y. Dec. 3, 2007). GLL has not challenged Konka's fraud claims as duplicative of its breach of contract claim. But, for avoidance of doubt, Konka's fraud claim is sufficiently distinct from its breach of contract claim. Konka claims "a misrepresentation of a present fact"—namely, that In Style and JED Lights were affiliates of GLL and desired to purchase Konka's lights—"that gives rise to a separate cause of action for fraudulent inducement," which is "separate and distinct from a breach of contract claim under New York law." *Id.* (emphasis omitted); *see also Deerfield Commc'ns Corp. v. Chesebrough-Ponds, Inc.*, 68 N.Y.2d 954, 956 (1986).

circumstantial evidence that GLL, through Yu and Kuang, acted with conscious misbehavior or recklessness. *Id.* at 290–91. Konka has, at a minimum, alleged the latter.[11]

In particular, the SAC alleges that Yu and Kuang represented falsely numerous salient facts: that In Style and JED Lights were affiliates of GLL, that Yu was authorized to act on their behalf, and that these Affiliates desired to purchase Konka products. *See* SAC ¶¶ 10, 25–27, 29–31, 61. The SAC also claims that Yu and Kuang falsified GLL purchase orders to make them appear as if they were coming from In Style and JED Lights and so they would be delivered to GLL offices on behalf of In Style and JED Lights. *See id.* ¶¶ 28, 32–35, 38–39. Viewed in combination, these allegations supply solid circumstantial evidence of conscious misbehavior—they describe intentional misconduct performed with the intention of inducing Konka to ship products to GLL on behalf of an entity that was not, in fact, a GLL affiliate and did not, in fact, desire to have GLL products. *See Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000) ("Intentional misconduct is easily identified since it encompasses deliberate illegal behavior,

---

[11] To adequately plead motive and opportunity, the facts pled must support that Yu and Kuang (1) had a motive to commit the fraud, namely they could realize "concrete benefits" from "one or more of the false statements," and (2) had an opportunity to carry out the fraud, meaning they had the "means and likely prospect of achieving concrete benefits by the means alleged." *Shields*, 25 F.3d at 1130. The Second Circuit has emphasized, in the securities fraud context, that a motive cannot be that "generally possessed by most corporate directors and officers," but instead, must be "a concrete and personal benefit" to the individuals committing the fraud. *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001). In the common law fraud context, some courts in this District have, similarly, required that plaintiffs plead a personal benefit unique to the individual, rather than one "common to all corporate directors and officers." *See, e.g.*, *PetEdge, Inc. v. Garg*, 234 F. Supp. 3d 477, 495 (S.D.N.Y. 2017). Others have found motive on other grounds, including based on the specific authority held by the employee or corporation in question (*e.g.*, to secure contracts, induce sales, or avoid financial losses). *See, e.g.*, *M-101, LLC*, 2007 WL 4258191, at *3; *Glidepath Holding B.V.*, 590 F. Supp. 2d at 455. Here, Konka has not alleged a personal benefit motive on the part of Yu and Kuang (although Konka does appear to allege opportunity). Such a showing is not necessary insofar as the complaint adequately pleads scienter by alternative means: circumstantial evidence that Yu and Kuang acted with conscience misbehavior or recklessness.

such as securities trading by insiders . . . or knowing sale of a company's stock at an unwarranted discount." (internal citations omitted)).

Even if these falsehoods did not qualify as intentional acts of deceit on the part of Yu and Kuang, the SAC alleges sufficient facts to support that these misrepresentations were made recklessly. Misrepresenting the relationship of In Style and JED Lights to GLL and Yu's ability to act on their behalf were each an "extreme departure from the standards of ordinary care." *Id.* (quoting *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47 (2d Cir. 1978)). Konka, to plead scienter, need only allege that Yu and Kuang had "knowledge of facts or access to information" that contradicted their statements. *Id.* Here, the SAC alleges that Yu and Kuang represented that In Style and JED Lights were owned by Yu or his family and had authorized Yu to act on their behalf. SAC ¶¶ 25, 29; *see also ABF Capital Mgmt. v. Askin Capital Mgmt., LP*, 957 F. Supp. 1308, 1327 (S.D.N.Y. 1997) ("[I]t is particularly appropriate to ease the pleading burden under Rule 9(b) when information is within the exclusive control of the defendant."). These allegations are sufficient to support that Yu had knowledge, or at least access to information, regarding In Style and JED Lights' relationship with GLL and their desire for Konka lights.

Konka's complaint thus alleges facts giving rise to a strong inference of fraudulent intent. The parties will test in discovery whether the evidence permits Konka to prove these factual allegations. *See Loreley*, 797 F.3d at 178; *Nat'l Credit Union Admin. v. Lee Family Ass'n*, No. 03 Civ. 3637 (LAK), 2004 WL 1064512, at *2 (S.D.N.Y. May 11, 2004).

### 2. Reasonable Reliance

GLL next argues that Konka has failed adequately to plead its reasonable reliance on Yu and Kuang's alleged fraudulent statements.

Under New York law, Konka was required to plead facts to show that it reasonably relied on Yu and Kuang's misrepresentations. *See Lazard Freres & Co. v. Protective Life Ins. Co.*, 108

F.3d 1531, 1541 (2d Cir. 1997). In considering this element, courts consider "the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them." *Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 195 (2d Cir. 2003). The Second Circuit has described "[t]he question of what constitutes reasonable reliance" as "always nettlesome because it is so fact-intensive." *Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91, 98 (2d Cir. 1997); *see also Meisel v. Grunberg*, 651 F. Supp. 2d 98, 118 (S.D.N.Y. 2009) (describing reasonable reliance as "largely an issue of fact"); *Glidepath Holding B.V.*, 590 F. Supp. 2d at 459 (describing reasonable reliance as "fact-specific inquiry" (citation omitted)). But there are "certain circumstances" where reasonable reliance "can be a proper subject for a motion to dismiss." *Glidepath Holding B.V.*, 590 F. Supp. 2d at 459 (citation omitted). "'A plaintiff cannot close his eyes to an obvious fraud, and cannot demonstrate reasonable reliance without making an inquiry and investigation if he has the ability, through ordinary intelligence, to ferret out the reliability or truth' of defendant's statements." *Equinox Gallery Ltd. v. Dorfman*, 306 F. Supp. 3d 560, 578 (S.D.N.Y. 2018) (alteration omitted) (quoting *Crigger v. Fahnestock & Co.*, 443 F.3d 230, 234 (2d Cir. 2006)). Here, the Court holds, Konka alleges sufficient facts to plead its reasonable or justifiable reliance.[12]

The SAC alleges that Konka reasonably relied on Yu and Kuang's representations and the falsified purchase orders in shipping lights intended for In Style and JED Lights. *See* SAC ¶¶ 38–39, 77. Examining the transaction in context, Konka's reliance on these representations was not unreasonable. To be sure, courts are less forgiving where, *inter alia*, (1) the parties to a

---

[12] Case law often interchangeably uses the terms "reasonable" and "justifiable" reliance in describing this aspect of New York law. *See JP Morgan Chase Bank v. Winnick*, 350 F. Supp. 2d 393, 405 (S.D.N.Y. 2004). The Court uses the term reasonableness here.

fraud were "sophisticated businessmen," (2) the parties were engaged in "a major transaction," (3) the plaintiff had access to "critical information but fail[ed] to take advantage of that access," or (4) the parties' agreement included "a contractual provision expressly disclaiming reliance on any oral representations" in entering the contract. *See Lazard Freres & Co.*, 108 F.3d at 1541–42 (citations omitted). Based on the pleadings, however, none of these features is present here.

First, as to the sophistication of the plaintiff and the size of the transaction, Konka is a Chinese goods company and the contract value of $1.9 million is not negligible. *See* SAC ¶¶ 1, 11, 18. But Konka is far smaller and less obviously sophisticated than the plaintiffs whom prior fraud cases have disqualified from relief. It is a cry from a Fortune 500 company that is "renowned world-wide for its . . . expertise," *Grumman Allied Indus., Inc. v. Rohr Indus., Inc.*, 748 F.2d 729, 738 (2d Cir. 1984), or "a sophisticated and major player in the bank debt market" that handles a bank debt portfolio of $760 million, *Lazard Freres & Co.*, 108 F.3d at 1534–35. And the transaction at issue, as alleged, was not a "major transaction" akin to a "$55 million corporate acquisition" where the plaintiff "was represented by a sophisticated group of counsel" and other professionals. *Grumman Allied Indus., Inc.*, 748 F.2d at 738. These factors do not, on the pleadings, call into question the reasonableness of Konka's reliance on Yu and Kuang's representations.

Second, this is not a case where Konka, as alleged, had access to "readily available information," which it failed to consider. *Glidepath Holding B.V.*, 590 F. Supp. 2d at 459. The SAC does not allege any facts suggesting that Konka "enjoyed unrestricted access" to GLL's "personnel and records" that would have enabled it to gauge GLL's true relationship with In Style and JED Lights. *Grumman Allied Indus., Inc.*, 748 F.2d at 738. Nor do the pled facts suggest that Konka "easily could have discovered the fraud had [it] reviewed specific documents

that were the subject of misrepresentations." *Allied Irish Banks, PLC v. Bank of Am., N.A.*, No. 03 Civ. 3748 (DAB), 2006 WL 278138, at *8 (S.D.N.Y. Feb. 2, 2006) (collecting cases). On the contrary, the SAC alleges that Konka reviewed the fraudulent purchase orders but was not able to discover the fraud. *See* SAC ¶¶ 38–39. Defendants have not cited any facts "that even hint at [Konka's] knowledge of the alleged falsity of the representations." *Meisel*, 651 F. Supp. 2d at 122. As a result, the pleadings do not suggest that Konka was, or should have been, on notice of any lack of affiliation between the Affiliates and GLL.

Third, the content of the agreement between Konka and GLL, as set out in the SAC, did not preclude Konka from relying on Yu and Kuang's oral representations. *See Lazard Freres & Co.*, 108 F.3d at 1542. Konka did not, for example, disclaim within the agreement such reliance, in which case it could not have "later assert[ed] that it was fraudulently induced to enter into the contract by the very representation it ha[d] disclaimed reliance upon." *Id.*

In addition to the aspects of the transaction examined above, courts also inquire whether a plaintiff "failed to properly investigate a transaction." *Glidepath Holding B.V.*, 590 F. Supp. 2d at 459. To be sure, the SAC does not allege that Konka independently investigated In Style or JED Lights' status in relation to GLL or their purported wish to purchase Konka lights. But the Second Circuit has held that "[w]hen matters are held to be peculiarly within defendant's knowledge, . . . [a] plaintiff may rely without prosecuting an investigation, as he has no independent means of ascertaining the truth." *Lazard Freres & Co.*, 108 F.3d at 1542 (quoting *Mallis v. Bankers Tr. Co.*, 615 F.2d 68, 80 (2d Cir. 1980)); *see also Grumman Allied Indus., Inc.*, 748 F.2d at 738 (noting that reliance may be justifiable where "undisclosed information was only known by—and indeed only available to—the defendants, and incapable of discovery by the plaintiff"). Such is so even where a plaintiff could have discovered the truth by inspecting

public records. *Todd v. Pearl Woods, Inc.*, 248 N.Y.S.2d 975, 977 (2d Dep't 1964), *aff'd* 15 N.Y.2d 817 (1965). The facts alleged here are of this nature. The SAC alleges that information about In Style and JED Lights was uniquely within GLL's and, in particular, Yu's knowledge. Specifically, the SAC states that Yu and Kuang represented that Yu or his family owned In Style and JED Lights, and that Yu was authorized to act on their behalf. SAC ¶¶ 25, 29. In addition, the SAC alleges, Geffen confirmed, on a conference call, that Yu was employed by GLL and authorized to enter contracts for it. *Id.* ¶ 19. Given Yu's central role in In Style and JED Lights, an inquiry directed to those companies by Konka regarding Yu could well have proven unfruitful.

Defendants note that Konka could have asked GLL for evidence of its affiliation with In Style and JED Lights, or that Konka could have gone to GLL's website, which they allege does not identify any affiliates. Def. Reply at 3. But on the facts pled, it is far from likely that such inquiries would have smoked out the fraud. In each instance, Konka would have been requesting evidence of fraud from GLL, the entity it alleges was engaged in the fraud. And as to documentation, Konka *did* receive purchase orders, via Yu's GLL email address, that indicated they were from In Style and JED Lights and requested delivery of products to GLL offices. SAC ¶¶ 21(i)–(j), 33, 35, 38–39. As to the website, GLL's present failure to list affiliates on its website, *see* Dkt. 43-4, even if accurately reflecting the status of the website as of the transactions at issue, is not conclusive evidence that a small business has no affiliates. The SAC therefore adequately pleads reasonable reliance.

The Court accordingly sustains the claim of fraud against GLL.

### B.    Fraud by Geffen

Defendants argue that Konka's claim of fraud against Geffen fails to plead four required elements for a fraud claim: a representation by Geffen, the falsity of that representation,

knowledge by Geffen that the representation was false, and reasonable reliance by Konka on that representation.  Def. Mem. at 8.  Konka responds that its claim against Geffen alleges a fraudulent omission, not a fraudulent misrepresentation, and that it has sufficiently pled the required elements, including Geffen's duty to disclose.  Pl. Mem. at 7; *see also Lerner*, 459 F.3d at 291–92 (fraud claim can be based on fraudulent concealment in the face of a duty to disclose material information).  Defendants counter that Konka's complaint fails to comply with Rule 9(b) because it did not specify that it was alleging a fraudulent omission claim, or allege a disclosure duty on Geffen's part or that he acted with fraudulent intent.  Def. Reply at 4.

Defendants are wrong that the SAC is defective because it does not overtly label its claim as one of fraudulent omission or concealment.  *See* Def. Reply 7.  The complaint, repeatedly, uses the label "fraud."  *See* SAC at 2, 13–14, 17.  The decisive issue instead is whether the facts pled adequately make out this species of fraud.

They do not.  A fraudulent omission claim must allege the usual elements of fraud— including a material omission of fact, knowledge of that fact's falsity, intent to induce reliance, justifiable or reasonable reliance by the plaintiff on the omission, and damages, *see Loreley*, 797 F.3d at 170—and "that the defendant had a duty to disclose material information," *UniCredito Italiano SPA v. JPMorgan Chase Bank*, 288 F. Supp. 2d 485, 497 (S.D.N.Y. 2003).  Here, the Court finds, the SAC's claims as to Geffen's knowledge and fraudulent intent are inadequate, such that there is no need to reach the issue of whether Geffen had an affirmative disclosure duty toward Konka.

The SAC's allegations as to Geffen's state of mind are highly conclusory.  These allegations are as follows:

- Geffen "knew" that Yu and Kuang were falsely representing GLL's relationship with the Affiliates and their authority to act on behalf of the Affiliates. SAC ¶ 61.

- Geffen "knew" that Yu and Kuang were making these false representations to induce Konka to deliver more products to GLL. *Id.* ¶ 62.

- Yu and Kuang submitted falsified product orders to Konka "with George Geffen's knowledge." *Id.* ¶ 63.

- Geffen "knew" that Konka would ship the products to GLL in reliance on the falsified purchase orders. *Id.* ¶ 64.

- Geffen "had a duty to disclose to Konka his knowledge" of the false representations and to reject products that were shipped by Konka relying on those representations. *Id.* ¶ 65.

- Geffen, along with Yu and others, caused Konka to deliver the lights in reliance on false representations. *Id.* ¶ 67.

These allegations as to Geffen's knowledge, at bottom, boil down to Konka's say-so that Geffen "knew" of Yu and Kuang's false representations, and that Yu and Kuang were modifying purchase orders "with [his] knowledge." *See id.* ¶¶ 61–63. Such unsubstantiated allegations are "too conclusory and speculative to support" a claim for fraud. *See PetEdge, Inc.*, 234 F. Supp. 3d at 495 (holding unsupported allegations that CEO "directed" fraud and that fraud was committed "with his knowledge and approval" inadequate to allege requisite intent); *see also Dash v. Seagate Tech. (U.S.) Holdings, Inc.*, 27 F. Supp. 3d 357, 362–63 (E.D.N.Y. 2014) (finding no fraudulent intent where plaintiff "conclusorily allege[d] that Defendant intentionally concealed and failed to disclose the true facts" about its product "for the purpose of inducing"

plaintiff to purchase such products (internal quotation marks omitted)).  The SAC is devoid of more specific allegations supporting Geffen's intent.

Konka thus fails the foundational requirement of Rule 9(b) that the plaintiff "state with particularity" the facts and circumstances that give rise to a strong inference of fraudulent intent. *See Lerner*, 459 F.3d at 290–91 ("strong inference" can be made from facts (1) alleging motive and opportunity to commit fraud, or (2) alleging strong circumstantial evidence of conscious misbehavior or recklessness).  The complaint identifies just three other facts that in any way might be said to connect Geffen to the fraud:

- Geffen is the founder and CEO of GLL.  SAC ¶ 3.

- On or about February 13, 2017, Konka had an initial business meeting with Geffen, where Geffen introduced Yu to Konka officials.  *Id.* ¶¶ 3, 19.

- On or about February 13, 2017, on a conference call, Geffen confirmed that Yu worked for GLL and had authority to contract for it.  *Id.* ¶ 19.

Contrary to Konka's argument, *see* Pl. Mem. at 7, Geffen's role and these circumstances, without more, do not sustain a plausible claim of fraud against Geffen.  Courts have, time and again, rejected the notion that the "organizational role of a defendant" is sufficient "to raise a strong inference of a defendant's scienter."  *In re Marsh*, 501 F. Supp. 2d at 483; *see also, e.g.*, *PetEdge, Inc.*, 234 F. Supp. 3d at 493–94 (rejecting claim that defendant must be liable for acts of subordinates because he was senior corporate officer); *Schwab v. E*TRADE Fin. Corp.*, 258 F. Supp. 3d 418, 434–35 (S.D.N.Y. 2017) ("The plaintiff cannot allege scienter by merely pointing to [CEO's] job title."); *In re LaBranche Sec. Litig.*, 405 F. Supp. 2d 333, 361 (S.D.N.Y. 2005) (collecting cases).  Under New York law, an officer is not liable for a corporation's fraud "merely by virtue of his office"; he must be alleged to have "direct[ed], authorize[d], or in some

meaningful sense participate[d] actively" in the fraud. *PetEdge, Inc.*, 234 F. Supp. 3d at 493 (citation omitted). The SAC does not allege Geffen's active participation.

The SAC's claims that Geffen introduced Yu to Konka and confirmed Yu's authority to act on behalf of GLL similarly fall far short of the conduct required to give rise to a strong inference of Geffen's fraudulent intent. *See id.* at 495–96 (finding CEO's role as "Project Manager" and his recipient of weekly status reports for a project where employees allegedly participated in fraudulent inducement insufficient for fraudulent intent). Geffen could equally have introduced Yu to Konka without any knowledge of Yu or Kuang's fraudulent aims. A strong inference must be as "cogent and at least as compelling as any opposing inference that one could draw from the facts alleged." *Silvercreek Mgmt., Inc.*, 248 F. Supp. 3d at 438–39 (quoting *Loreley*, 797 F.3d at 176–77). The facts do not support such an inference here.

The Court accordingly dismisses Konka's fraud claim against Geffen for failure to plead adequately his fraudulent intent.

### C.     Leave to Amend

Konka requested leave to amend its complaint to resuscitate any dismissed claim. Pl. Mem. at 9. "Leave to amend should be freely granted, especially where dismissal of the complaint was based on Rule 9(b)." *Acito*, 47 F.3d at 55; *see also Luce v. Edelstein*, 802 F.2d 49, 56 (2d Cir. 1986) ("Complaints dismissed under Rule 9(b) are 'almost always' dismissed with leave to amend." (citation omitted)). District courts have discretion to grant or deny plaintiffs leave to amend their complaints, but "there must be good reason to deny the motion." *Acito*, 47 F.3d at 55.

Although the question is a close one given the Court's issuance of an amend or oppose order, the Court will grant Konka leave to amend one final time, solely to bolster its deficient fraud claim against Geffen. Such leave would not be futile, if Konka is able to add specific facts

and circumstances that support its claim of fraud against Geffen.  The Court will give Konka two weeks—but no more, in the interest of moving this litigation forward—to amend to shore up its claim.

## CONCLUSION

For the foregoing reasons, the Court denies defendants' motion to dismiss Konka's fraud claim against GLL and grants the motion to dismiss Konka's fraud claim against Geffen, with leave to amend.  Any amended complaint shall be due by Tuesday, December 17, 2019.  The Clerk of the Court is respectfully requested to terminate the motion pending at docket 37.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: December 3, 2019
       New York, New York